WILLIAM OWENS *et al.*\*

*v.*

JOHN WEEDMAN.

1. TROVER—*plaintiff must have right to possession.* To maintain trover the plaintiff must show a tortious conversion of personal property, and that, at the time of such conversion, he had a right of property in the chattel converted, and also had the possession thereof, or a right to its immediate possession.

2. SALE—*right to possession by vendee.* Where personal property is sold and a part of the price paid down, and the balance is to be paid on delivery, the right of property will pass as between the parties, but not the right to possession until the full price is paid; and if a credit is given as to part of the price, and possession is not taken by the vendee until the credit expires, the rule is the same.

3. SAME—*right of vendor to resume possession.* Where a party sells two car loads of hogs, to be paid for as weighed and delivered, and receives part payment, and makes an entire delivery in pens for the purchaser, under the expectation of immediate payment, on a neglect or refusal to make complete payment, the vendor may resume the possession of all the hogs, and hold

---

\* This case, and the five next following, were of January term, 1876, and omitted from their proper place.

them at the purchaser's expense until full payment is made, especially when the purchaser has done no act accepting the delivery, and if payment is not completed in a reasonable time, dispose of them and account to the purchaser for the proceeds.

4. SAME—*remedy for wrongful sale by vendor.* If, in case of the sale of chattels, the vendor, in default of payment on delivery, or where a delivery is offered, should make a wrongful sale by reason of being too hasty, or without proper notice, he will not be liable in trover, but in an action on the case, or in assumpsit, for any surplus that may be due the purchaser.

APPEAL from the Circuit Court of DeWitt county.

This was an action of trover, by Weedman against Owens and Drybread. The plaintiff, in his declaration, alleged, in substance, that he was lawfully possessed, as of his own property, of 150 hogs, and lost them, and the same came into the possession of defendants, and that they converted them to their own use. Defendants pleaded not guilty, and on trial a verdict of guilty was rendered, and the plaintiff's damages assessed at $550, for which judgment was entered against the defendants, and from this judgment they appeal to this court. A motion for a new trial was made by defendants and overruled, and defendants excepted. All the evidence is preserved by bill of exceptions.

At the trial Weedman testified, in substance: "I am a resident of McLean county. My business is farming and feeding stock. I have an interest in the bank, and also in a flouring mill. About May 13, 1873, I met Owens in Farmer City, by the bank. He wanted to sell me some hogs. He said he had bought about 90 head, and wished to sell them to me. I inquired his price, and he said he paid $4.40 to $4.50. We made a trade. I told him that 90 head were too many for one load and not enough for two, and I did not want to buy the whole 90 hogs unless he would furnish me enough to make the two car loads. He said that he could buy them, and I told him I would take the hogs at the price he set, and he was to go on and furnish the two car loads. He thought they would weigh about 200 pounds. I thought it would take about 70 to the load. This was Tuesday or Wednesday. I gave him until

Friday to get the hogs in. He said he could buy some hogs of Watson, and I gave him $20 to pay on those hogs of Watson's. I agreed to give him $15 for his labor in getting up the balance to make out two car loads. The conversation was: I told him I did not want to do the work. He said he could buy the hogs, and thought likely he could buy them for less money. I considered $4.50 a big price, and told him not to go beyond $4.50—that I would give him $15 to buy the hogs and load them. I went then and ordered two cars for Friday. As to getting the rest of the hogs in, he said he could not get them in Thursday, but would have them in by Friday. The hogs were to be weighed at McLain's, except some that he thought would have to be weighed at Argobast's. Further than what was said about the $20 to pay Watson, nothing was said about money in any shape, to pay on those hogs. I don't recollect that I saw Owens any further at all. I think the next day he told me what hogs he had bought, and that he would have them in on Friday morning."

Weedman further testified, that on Friday he came to town, about 11 o'clock in the forenoon; went first to the bank; inquired for Owens, but he was not there. He afterwards went to the yards to find Owens. He was not there. He says he found about 90 hogs there, but did not learn where Owens was, though he made inquiries of three or four persons. He testifies that he waited about the bank until about 2 o'clock, *then* rode to the depot to seek Owens, and remained until about 3 o'clock, and then went down to the bank, and while there paid one of Owens' checks, and told Lewis, the clerk at the bank, to pay no more of Owens' checks, and said to Lewis, he would be down in the morning and tend to the hogs himself, as it was then too late to ship the hogs that evening. He left no message for Owens. He merely told Lewis not to pay Owens' checks. Weedman adds: " I expected to get the hogs in, and when delivered to pay for them." He then went home, and did not return the next day, but on the next day (some of his family being ill) he sent a messenger (Mr. Houston) to Owens, " to ship one load of hogs (I told him to bill them to Conover

& Hall), and to hold the others until I came down—to hold the lighter hogs and ship the heavier ones." Houston, when he returned, told me Owens was out of humor—that he said, "he would manage that thing to suit himself," and got upon the train, and said: "If John's folks are sick, tell him we will do what is right about the hogs."

Weedman further testified, that he "paid on the hogs $730.55." He further testified, that "Owens was not worth anything financially, although I had trusted Owens before with money, and he had bought stock for me. I gave Lewis instructions on Thursday evening, that if I did not come down in time, if any of these hogs came in, to pay for them until I came down. There was nothing passed between Owens and myself at all, in reference to the payment for the hogs. I paid out on these hogs $730.55, and never got anything out of them."

On cross-examination Weedman testified: "I told Owens I would not buy the hogs he had bought unless he would buy enough for two loads, and then he agreed to buy two car loads. I was to pay him $15 in addition to what the hogs cost. I made this contract on Wednesday, and the hogs were to be delivered on Friday. The bigger portion of them were to be delivered at McLain's scales, and a portion of them, he thought, he would have to weigh out at Argobast's. I consented to it. I was to receive the hogs at McLain's scales. On the day the hogs were to be delivered, I was at home in the morning, and at the scales about 11 o'clock. It was the calculation that I was to pay for the hogs on delivery. I think nothing was said about it. I did not tender to Owens any money for these hogs, nor authorize any one to do so. I did not know but what Owens had made arrangements with the farmers. We frequently make arrangements not to pay for hogs until we ship them. I should say that Owens could not raise the money to pay for the hogs unless some one let him have money, or made some arrangements with him some way. The hogs were shipped Saturday evening."

Lewis, the clerk in the bank, testifies that he was present

when Weedman and Owens made their bargain about the hogs. He swears: "Mr. Weedman bought the hogs of Owens, what he had on hand, and objected to the amount on the score that it was neither one or two car loads, and said he did not care about them unless Owens made up two car loads, which Owens agreed to do. I understood he was to have $15 for his services. I understood the $15 was a bonus over and above the price of the hogs. It was for buying the hogs. The hogs were to come in on Friday. Owens came in on Thursday, and wanted me to pay his checks. I told him I could not do it— that I had no instructions from any one to pay his checks. I believe I did not give Owens any reason, but that was my reason for refusing. On Thursday evening I saw Mr. Weedman, and asked him if it would be right to pay Owens' checks. He told me, yes, to go on and pay until he came down. These checks were to be in payment for the hogs—to the parties to whom Owens gave them for payment for the hogs—John Weedman's hogs—hogs that John Weedman had bought of Owens. On Friday evening, after Weedman had told me not to pay any more checks until he came back. I had paid out $710.55, including one check which I did not pay. When I told Owens, on Friday evening, that Weedman had directed me not to pay any more checks until he came down, Owens said he thought that was a great way to do business—that the men were there waiting for their money for their hogs."

On cross-examination he said, that the money he paid on Owens' checks was charged to Owens on the bank books, and was afterwards charged to Mr. Weedman. The idea was, that the checks were to be charged to Owens for the time being, and as soon as Owens and Weedman settled, Weedman would give his own check for the amount. That was the understanding with Weedman and myself. We had a talk about it. For the time being, Owens was to check and I was to pay his checks. After the transaction was over, and it was settled for, Weedman was to take these up and give his check for the amount. That was the agreement between Weedman and me, but as the thing terminated as it did, it was carried for some

time against Owens, but it was afterwards charged to Weedman by the bank.

Houston testified, that on Saturday, at Weedman's house, Weedman told me to go down and tell Owens that his family was so that he could not leave, and to ship a car load of hogs, 15,500 pounds in a car, and he would make it all right when he came down. I went down and told Owens, and Owens said: "I am going to ship them hogs." Mr. Drybread spoke up, and said he was going to ship the hogs; that he was going with Owens; that he was interested in the hogs. When I first saw Owens the hogs were not in the car, but were in the pen. I went on and sent the doctor out, and when I got back the hogs were all in the cars. It was afternoon when I first got there. I told Owens to bill the hogs to Conover & Hall, but I suppose the hogs were already billed.

Being cross-examined, witness said: When Weedman sent me down there, he said "he had bought two car loads of hogs of Owens—he had contracted two car loads of hogs of Owens; that there was to be two car loads of hogs in there."

On re-direct, he said, Weedman told me he had two car loads of hogs to go from Farmer City that evening. He said he had employed Owens to buy him two car loads of hogs, and he was to ship them that evening.

On cross-examination, witness said he did not remember whether or not he had, at first, testified that Weedman said "he had bought two car loads of hogs of Owens."

Testimony was also given, in behalf of plaintiff, that these two car loads of hogs were shipped on Saturday evening by Owens and Drybread, in their names, to Chicago, with the consent of those farmers who had let Owens have hogs, which were not paid for; and that these hogs were sold in Chicago for over $1100, and that Drybread received some $800 of the money, and, in a conversation had with Owens after his return, gave him to understand that, after paying the farmers' bills, he would pay over the residue of the money to Weedman, but that, instead, he paid it all out to creditors of Owens, in obedi-

ence to alleged garnishee proceedings demanding that he should
do so.

Jones, a witness called for plaintiff, says that, about 2 or
3 o'clock on Friday, there was considerable confusion about
the refusal to pay the checks at the bank, and Owens said if
Weedman would come down it would be all right.

Witnesses for the defense showed that the hogs weighed at
Argobast's scales were driven down to the yards, near the
place of shipment, in the afternoon of Friday, and that all
these hogs were sold by the farmers to Owens.

Owens testified: "I was buying hogs in the neighborhood,
as usual, and I had a couple of car loads bought, with the
exception of a few, and I saw Mr. Weedman and proposed to
sell them to him. He said he would buy them, and asked
when I could bring them in. I told him they were to be
brought in on Friday. He and I traded. I told him what I
gave for them. We agreed on the price, and he bought the
hogs of me. I lacked, I think, 15 hogs when he made the
purchase, but I agreed, in the trade, to put in them 15
hogs, and have them ready Friday morning. He was going
to ship them Friday evening. I bought my hogs, and had
them all in hand according to my contract. When Friday
morning came, the hogs came in. I went to the scales, and
there was nobody there to receive them. I went to weighing
the hogs—what I got of them. I weighed until 11 o'clock. I
weighed about 99 head at McLean's scales, in Farmer City.
Then I had about 40 head to weigh at Argobast's scales, north
of town. This was nearer to the shipping pens. I saw nothing
of Weedman. I held the hogs all day Friday, and then took
the hogs and put them in the pen. I fed them Saturday morn-
ing, and still nobody appeared. I kept them until Saturday
afternoon, till it got pretty near shipping time, still nobody
came. I turned the hogs out, and took them to the shipping
pens. I had part of them in the shipping pens—those weighed
at Argobast's. I turned all the hogs in there, and had them
ready. I held them there until time to ship Saturday evening,

and then loaded them and shipped them. I had two car loads there on Friday. I should judge it was between 2 and 3 o'clock on Friday when I had the last of the hogs ready to deliver. I inquired for Weedman on Friday. I went into the bank in the morning, as soon as it was open, and inquired for him. The clerk could not tell me anything about him. I then asked the clerk if Weedman had made any arrangements about paying for the hogs. He said, he had not. Lewis said to me, can't you weigh the hogs? I said I did not like to do so without Mr. Weedman being there. He told me to go on and weigh them; he thought Weedman would be down after a while, and it will be all right. He said: 'Take some of these blanks off the books, and *check*, and *I will pay*.' I did so. I went to McLean's scales, and received the hogs from the farmers, and weighed them, giving each a check for what his hogs came to. When I got through at McLean's scales, I went to Argobast's scales to weigh the hogs there. I weighed part of the hogs there, and checked on the bank as I had been doing. After we got through weighing there, we drove those hogs out, down to the shipping pens. Between 3 and 4 o'clock on Friday it was reported to me that the bank refused to pay the checks. At this time I had moved the hogs weighed at McLean's scales to McCord's lot, in town, where there was water and a convenient pasture to feed them. The hogs weighed at Argobast's were in the shipping pens."

On cross-examination, Owens testified: "I never made any agreement at all with Weedman to buy any hogs. I bargained to sell him two car loads of hogs. He was to give me $15 over and above what I paid for the hogs. The hogs were to be delivered on Friday. We got through weighing at McLean's Friday about 11 o'clock. I then went home and ate my dinner, and from there I went to Argobast's. I think I got there about 12 o'clock. I judge it was between 2 and 3 o'clock when we started the hogs down from Argobast's. I went down with them all the way. They were put in the shipping pens. We got to the pens with the hogs from Argobast's

about 3 o'clock, as near as I can tell by guessing. I then went down town."

There was much other testimony, but none other relating to the nature or substance of the contract between Owens and Weedman, or relating to the question of the payments made by Weedman, or to the question of the delivery of the hogs to Weedman, or to any other material fact which occurred before or at the time that Owens and Drybread shipped the whole of the hogs to Chicago in their own names.

Messrs. FULLER & GRAHAM, and Messrs. LEMON & HERRICK, for the appellants.

Mr. A. HAYNIE, Mr. DONAHUE KELLEY, and Messrs. MOORE & WARNER, for the appellee.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

To maintain trover, the plaintiff must show a tortious conversion of personal property by defendant, and that, at the time of such conversion, the plaintiff had a right of property in the chattel converted, and also had the possession thereof, or a right to the immediate possession.

This right to possession must be absolute and unconditional. It is said in 1 Chitty's Pleadings, 167: "To support this action the plaintiff must, at the time of the conversion, have had a complete property, either general or special, in the chattel, and also the actual possession thereof, or the right to the immediate possession of it." In the second volume of the same work, 618, it is said: "It is essential in trover that the plaintiff should have the possessory title—that is, the right to the immediate possession of the goods."

In *Bloxom* v. *Saunders*, 4 Barn. & Cres. 941, it was held, that the vendee of undelivered goods who has not paid or tendered the price, and has not, therefore, acquired the right of possession, can not maintain trover against the vendor who wrongfully sells them. Saunders sold hops to Saxby, to be paid for, by the usage of the trade, on the second Saturday after the sale, and gave him bills of sale, but the hops remained

in possession of Saunders until Saxby became bankrupt, and Bloxom was made his assignee. Saunders then sold the hops, rendering account of sale as made on account of Saxby, and charging warehouse rent from the date of purchase by Saxby. Bloxom brought trover. Held, it would not lie for want of right of possession in plaintiff at the time of the conversion. The court assume that the right of property passed by the sale, but his right of possession was not absolute. In such case, it is said, the property is vested in the buyer by such sale, so as to subject him to the risk of accidents, but he has not an indefeasible right to the possession.

Again, in the case of *Bloxom* v. *Morley*, (Eng. C. L. 872,) certain hops were sold by Morley to one Saxby, on a credit. The hops remained in the possession of Morley until the time for payment expired. Saxby had paid £700 towards the price, but a part of the price remained unpaid. Saxby, in this condition of affairs, became bankrupt, and Bloxom became his assignee in bankruptcy. Morley afterwards sold the hops to a stranger without demanding payment of the balance due upon the hops, and without returning or offering to return the £700. Bloxom brought trover, and it was held by the court that the right of property in the hops passed to Saxby by the sale, and the right of possession also, but on the failure to pay the full price, the property remaining in Morley's possession at the expiration of the time of the credit, Saxby lost his right to possession, and had no right to possession until the full price was paid or tendered. It was also held, that the sale by Morley without returning the £700 was wrongful, but the court held that an action of trover would not lie in the case, because, at the time of the conversion, the right of possession was not in the plaintiff. The court say, in substance, that a special action on the case might have been maintained against Morley for the wrongful sale, but not trover.

In the case of *Wilmshurst* v. *Bowker*, 5 Bingh. N. C. 541, defendant had sold to plaintiff a quantity of wheat, and shipped the same to plaintiff, and sent plaintiff the invoice and bills of lading. The wheat was, by the contract, to be paid

for by plaintiff by remitting to defendant a draft of a London banker, on the receipt by plaintiff of the invoice and bill of lading. The plaintiff received the invoice and bills of lading, but failed to send the banker's draft on London, but sent in lieu his own draft. The defendant, without further notice, stopped the wheat *in transitu,* and sold the same to a stranger, and Wilmshurst brought trover. The court say, admitting that the contract of sale vested the property in the wheat in the plaintiff,    \*    \*    \*    the failure of plaintiff to send the banker's draft prevented the right of possession from vesting in him, and held that the action of trover could not be maintained.

In the case at bar, the evidence tends to show that the contract of sale under which plaintiff claims right, was for two car loads of hogs, to be delivered on Friday and to be paid for on delivery. Weedman and Owens, who made the contract, so testify, and the testimony of Lewis, the only other witness who testifies on the subject, is to the same effect.

The hogs were all weighed and set apart for Weedman under this contract, and it may well be that the right of property thereby became vested in Weedman, so as to render him liable to loss or injury by accident; but he did not pay the whole price, and hence never had the right of possession.

It is insisted, that, from the nature of the transaction and the circumstances, it was a part of the agreement that the hogs were to be delivered in installments, and paid for in install - ments as the weighing progressed, and that, so far as concerns the hogs weighed at McLain's scales, the placing of them in McLain's yard for the plaintiff, and the payment of the checks for the price of the same by plaintiff's agent, gave plaintiff the actual possession and the right to retain the possession of these hogs—and so the court charged the jury.

This position is not sound. The contract was an entirety, and embraced the two car loads. The parties did not make separate contracts as to each installment of hogs. The plaintiff, in such case, did not, under the most favorable view of the circumstances, get an indefeasible right to possession even

of these hogs. It may be conceded that the delivery of the whole two car loads was begun, and that the payments kept pace with the delivery a while, and even that the entire delivery to Weedman was completed, under the supposition that the concurrent acts of payment were in course of execution; still, when Owens found that Weedman had failed to perform the concurrent act of full payment, he had the lawful right to resume the possession of all the hogs which were the subject of the contract, and hold them until full payment was made. He did resume the possession—and that he had lawful right to do—and, having done so, the plaintiff had neither the possession nor the right to immediate possession.

This was the condition of this property when Drybread united with Owens and shipped all the hogs to Chicago. It may be conceded that Owens had not the lawful right to thus dispose of this property, without first refunding to Weedman the money he had received under the contract, but, as was held in *Bloxom* v. *Morley, supra,* for this wrong trover will not lie, for the simple reason that, at the time of the conversion, Weedman did not, in any view of the subject, have the lawful right to the immediate possession of the property.

The court instructed the jury:

"1st. That if they believe, from the evidence, that Owens sold to Weedman about ninety head of hogs, that said hogs were weighed and put in the pen for Weedman, and that checks to the amount of $710 were drawn by Owens upon the banking house of Thomas Bros. & Weedman, and were paid· at said bank out of money belonging to Weedman, and $20 in addition was paid to Owens by Weedman, and if they believe, from the evidence, that defendants took said hogs from said pen without the consent of Weedman, and that they sold said hogs and converted the proceeds thereof, then they should find for the plaintiff the value of the hogs in Chicago, less the necessary expenses of disposing of them."

The proof shows that the sum of $730.55 paid by Weedman was not the full price of the two car loads which he agreed to

take (and of which this lot of about ninety hogs was a part), and tends to show that it was not full payment, even for the hogs so weighed and put in the pen from McLain's scales.

The instruction, then, is erroneous, in telling the jury that if $730 was paid on this lot of hogs (though not the full price even of *that* lot of hogs), and the hogs were weighed and put in the pen for Weedman, that invested Weedman with such possession and absolute right of possession, that, although he neglected to pay the full price, Owens had no right to stop the hogs *in transitu*, before Weedman had assumed control of them, and resume the possession until full payment was made.

If, in the case of *Wilmshurst* v. *Bowker, supra,* the vendor, after he had delivered the wheat on a ship for the vendee, and sent him the bill of lading, had the right, on the failure of the vendee to send him the London banker's draft, to resume the possession of the wheat, surely Owens, on the failure of Weedman to make full payment, had a right to resume the possession of the hogs, which, as suggested, he had put in the pen for Weedman, and especially as Weedman had done no act accepting the supposed delivery.

In the fourth instruction, the jury were told that Drybread and Owens had no right to intermeddle with Weedman's hogs, if the hogs were Weedman's, unless so directed by Weedman; and if the jury believe, from the evidence, that Drybread and Owens did, without the consent of Weedman, ship to Chicago and sell *the hogs* that belonged to Weedman, then they are liable to Weedman for the value of the hogs so shipped, less, etc.

This instruction is erroneous in assuming, as an ascertained fact. that some of the hogs mentioned at the trial were Weedman's hogs. The court speaks of "the hogs that belonged to Weedman," when it was, on the evidence, a mooted question whether Weedman had, at any time, the right of property in any of these hogs.

But the great error in the instruction consists in assuming that the right of *property* in plaintiff was sufficient to support this action, without showing a right to possession in plain-

tiff and a tortious conversion. The court says, in substance, that "if defendants, without the consent of Weedman, did ship to Chicago and sell the hogs that belonged to Weedman, then they are liable." This is not the law of this case. It may be that Weedman, by his contract of purchase, and by the weighing and setting apart in pens of the hogs for him, became the general owner of these hogs, and yet it may be that his contract was for the purchase of two car loads of hogs to be paid for on delivery, and that, by his failure to make payment, he failed to acquire the right to the possession. There is surely proof tending to show that this was so. If Weedman, by the contract, bought two car loads of hogs, to be delivered on Friday to him, by Owens, and the mode of delivery was to be made in parcels as they were received from the farmers, and Owens had the hogs at the places agreed upon, and the delivery begun, and the payments kept pace for a while with the progress of delivering, and, before it was completed, Weedman stopped the payment, and Owens went on and weighed all of the hogs, and still Weedman neglected to complete the full payment, in such case, Owens had the lawful right to resume the possession of all the hogs, and hold them as Weedman's hogs, and at Weedman's expense, until full payment was made; and if payment was not made in a reasonable time, he would have the right to dispose of the hogs, and account to Weedman for the proceeds.

If he, in such case, should make an improper sale (wrongful, by reason of being too hasty or without proper notice), he would be liable to a special action on the case, but not in trover; for, at the time of the wrong, Weedman, in the case supposed, could not show a right to the possession. If he should fail to account for the proceeds, he might be sued in assumpsit, and possibly in trover, for a conversion of the money. This action is for the conversion of the hogs, and not for the conversion of the money.

This fourth instruction is fatally wrong.

The fifth instruction is equally faulty. The court there tells the jury, in substance, that if any of the hogs had been

paid for and received by Weedman, and defendants took these hogs and shipped them with other hogs belonging to defendants, and sold them on their own account, and failed properly to account to plaintiff, then the verdict should be for the plaintiff.

This instruction, like the fourth, ignores the proofs tending to show the entirety of the contract of purchase, and the right of the vendor to reclaim the hogs paid for and received. if, before the whole transaction was completed, Weedman refused to make the payments required. By receiving and paying for part of the hogs as the delivery proceeded, Weedman did not get an indefeasible right to the possession of the hogs so received.

The sixth instruction was calculated to mislead the jury. It had no relation to any matter in issue. The action was for the conversion of the hogs, not for failure to properly account for the money received.

The two instructions given by the court, on its own motion, are faulty, in ignoring the right of Owens to resume possession of all the hogs, for failure to pay in full for the hogs, or, perhaps, in failing to recognize the rule that, to maintain trover, the plaintiff must have had the unconditional right to possession at the time of the alleged conversion. It is the more important that this rule of law should be enforced in behalf of Mr. Drybread, who seems to have been drawn into the complication of this case by the failure of plaintiff to comply with his contract with Owens, and seems to have embarked in the matter with no other motive than to secure himself and some of his neighbors from apprehended loss. It is not clearly shown that he committed any error in paying out the proceeds, or that he acted in bad faith. If it be so, he can be held in assumpsit, for what is justly due, but can not be held in trover where the measure of damages is the full value of the property taken, and opposing accounts can not be adjusted.

The judgment of the circuit court is reversed, and the cause remanded.

*Judgment reversed.*