# James H. Hughes, Appellee, v. Finley Barrell et al., Appellants.

## Gen. No. 15,962.

1. PLEADING—*when declaration is "special action on the case."* *Held,* that the court set forth in the opinion in this case constituted "a special action on the case" and was not merely in trover.

2. MEASURE OF DAMAGES—*in action to recover for unauthorized sale of pledge.* If corporate stock, having a market value, held by way of pledge for an existing indebtedness, is sold without authority, the measure of damages is the amount at which the owner of the pledged stock could have replaced it by a purchase in the open market when he has learned of its unauthorized sale, giving him a reasonable time to accomplish this result, less the amount for which said stock was pledged.

3. PLEDGES—*duty of stock broker.* A stock broker carrying stock purchased on margins has to hold and carry such stock until the owner thereof fails to respond to margins called for under the usage and custom of the business, or has failed to pay in full and take the stock if required and notified to do so. If reasonable notice is given with such a demand, that on failure to comply with said demand the stock will be sold, or if reasonable notice is given on such failure that a sale will be made, the broker, who is in law a pledgee and subject to the rules of law concerning pledges, may sell. But notice is indispensable. If the owner of the stock is about to depart from the country, so that notice is impossible or difficult to serve, and so informs the broker, the burden is upon the broker to provide by special contract for the right to sell in the event of an emergency.

Appeal from the Municipal Court of Chicago; the Hon. FRANK CROWE, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed February 5, 1912. *Certiorari* denied by Supreme Court (making opinion final).

FREDERICK SASS and BRÖDE B. DAVIS, for appellants.

E. F. DUNNE and O'SHAUGHNESSY & O'SHAUGH-NESSY, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

August 11, 1908, the appellee, James H. Hughes, sued the appellants, who were doing business as Finley Barrell and Company, in the Municipal Court of Chicago in an action of the first class. It was denominated in praecipe and summons "a plea of trespass on the case." He filed in said suit a declaration in two counts. The first was in the ordinary common law form used immemorially in actions of trover, asserting that on November 16, 1907, the plaintiff was "lawfully possessed" of, and "casually lost," certain shares of corporate stock, and the defendants came into possession of them "by finding," etc. We think it may be entirely disregarded and the cause here be considered on the question of the form of action and of pleading raised by the appellants, as though the second count in the declaration stood alone.

The second count was as follows:

"And ALSO FOR THAT WHEREAS the plaintiff on, to-wit, October 15, 1907, in the City and County aforesaid was lawfully possessed as of his own property of certain goods and chattels, to-wit, Two Hundred (200) shares of the common stock of the American Car & Foundry Company, two hundred shares of the common stock of the United States Steel Corporation, and one hundred shares of the common stock of the Pressed Steel Car Company of the value of Twenty Thousand Dollars, and on being so possessed thereof, the plaintiff afterwards, on, to-wit, on the day aforesaid, placed said goods and chattels in the possession of defendant for safe keeping; yet the defendants well knowing the said goods and chattels to be the property of the plaintiff, on, to-wit, November 16, 1907, wrongfully and improperly and without the knowledge or authority of plaintiff, sold the same and converted and disposed of the said goods and chattels to their own use; to the damage of the plaintiff of

twenty thousand dollars, and therefore he brings his suit.''

The defendants filed a plea of the general issue (not guilty), and the cause proceeded to trial before a jury, which, with certain special findings hereinafter mentioned, found a general verdict for the plaintiff, assessing his damages at $3,400. A motion for a new trial was made by the defendants and was overruled, and a motion in arrest of judgment was disposed of in the same way. Judgment was then entered against the defendants in favor of the plaintiff on the verdict and this appeal followed.

One position is taken by the appellants which should be disposed of before the merits of the claim, which has been thus reduced to judgment, are discussed. It is that the plaintiff mistook his action, which the appellants, in accordance with the phraseology of the first count of the declaration, naturally call an action of ''trover.''

The claim of the plaintiff, as the evidence showed, was based upon the sale by defendants, without authority from or notice to him, of certain shares of stock, which as will be hereinafter more particularly pointed out and, as is indeed conceded, belonged to the plaintiff but were held in pledge by the defendants for a fixed amount of indebtedness owing by him to them. The defendants (appellants) say in their argument: ''At the time of the alleged conversion (through the sale by appellants) he had not paid for them in full nor tendered to appellant the amount necessary for that purpose. He therefore had no right to the possession of the stocks and cannot maintain an action in trover for their conversion.''

To sustain this proposition they cite Owens v. Weedman, 82 Ill. 409. This case was one in which the plaintiff, Weedman, sued the defendant, Owens, in trover (as the report of the case says) because Owens

had taken possession of some hogs, of which there had been an imperfect and uncompleted sale by Owens to him. The court, in discussing the facts and the instructions, says that if certain facts were true, then "in such case Owens had the lawful right to resume the possession of all the hogs and hold them as Weedman's hogs and at Weedman's expense until full payment was made, and if payment was not made in a reasonable time he would have the right to dispose of the hogs and account to Weedman for the proceeds. If he, in such a case, should make an improper sale (wrongful by reason of being too hasty or without proper notice) *he would be liable to a special action on the case,* but not in trover, for at the time of the wrong Weedman, in the case supposed, could not show a right to the possession."

It would appear from the report of this Weedman case that the declaration contained only the conventional form of the "casually lost" trover count; but in the case at bar the gist of the second count, which we have recited, is that the defendants wrongfully, without authority or notice, sold the property of the plaintiff in their possession. What does this make this action but "a special action on the case?" The Weedman case says such an action would lie.

As pledgees, having possession of the shares of stock and the certificates for them, the defendants sold not only their interest, but the reversionary interest of the plaintiff in them, and it is for the damage caused by that sale of the reversionary interest for which the plaintiff sued and for which he has recovered. He asked and obtained as damages, as will hereinafter appear, only the amount which he lost by a sale of the stock, according to his theory unauthorized and wrongful. That amount was the difference between what he received credit for on his indebtedness, for which the stock stood pledged, and the legitimate

value to him of the stock wrongfully sold. That value to him was, according to the rule of damages most favorable to the defendants, fixed at the amount at which he could have replaced it by a purchase in the open market when he first learned of its unauthorized sale, giving him a reasonable time—four days—to accomplish this result.

We think the defendants can make no meritorious objection to the form of action or to the measure of damages adopted.

That which was said by the Supreme Court of Massachusetts in the case of an action for an unauthorized sale of collateral held in pledge as security, is applicable, *mutatis mutandis,* in the case at bar:

"In the present case all was done by the plaintiff that could be useful. The defendant had sold the notes and the mortgages had been discharged when the plaintiff called upon him with his counsel. He had obtained a sufficient amount to pay the plaintiff's notes to him, and the plaintiff could only claim the balance due on the securities and covered by the mortgages. A formal tender of the amount of the notes would have been a useless ceremony, such as the law never requires."

To the same effect is the opinion of Chancellor Kent in Cortelyou v. Lansing, 2 Caine's Cases, (N. Y.), 203, (1805), in which the Chancellor held that after the sale by the pledgee the pledgor need not make a tender of the amount due nor a demand of the securities before bringing his action. (Although Kent in 1810 alluded, in Barrow v. Paxton, 5 Johnson, 260, to this opinion as published without authority, he reaffirmed it as his in 1816 in Hart v. Ten Eyck, 2 Johnson Ch. 100.) And this is also the doctrine laid down by the catena of authorities cited by the Encyclopaedia of Pleading & Practice in its Article on Pledges, vol. 16, p. 649, to the assertion that "Before bringing an ac-

tion at law to recover the pledge or its value, the pledgor must tender payment of the principal debt; *but where the pledgee has voluntarily put it out of his power to return the property, his lien is discharged and such tender by the pledgor is rendered unnecessary."*

Passing to the merits of the controversy, it seems desirable to make a statement of the facts which gave rise to it before discussing the application of the law thereto. The plaintiff, James H. Hughes, was in 1907 a retired business man, residing in Detroit, Michigan. The defendants, under the firm name of Finley Barrell & Company, were stock brokers in Chicago who had a branch house and agents in Detroit under the management of a concern known as Walder & Hayhurst. During the year 1906 Hughes became a "customer" or "client" of the defendants through this branch house. He apparently bought and sold some stocks and bonds at various times in 1906 and in 1907, before July 1st of that year. However that may be, it appears in the record herein that on July 1, 1907, he gave orders, which were executed, to Finley Barrell & Co., through their Detroit branch, to buy and carry for him 100 shares of American Car & Foundry Company stock and 100 shares Pressed Steel Car Company stock; on July 8, 1907, 100 shares of "Mackay" stock; July 27th, 40 shares of Missouri, Kansas & Texas Railway; July 31st, 200 shares of United States Steel Corporation; August 5, 1907, 100 shares more of American Car & Foundry Company; August 14, 1907, 50 shares of Mackay; August 15th, 50 shares of Southern Pacific Railroad, and August 30, 1907, 20 shares of "Calumet and Arizona," (a copper company stock). All these were held and carried for him on October 1, 1907, except the 50 shares of the Southern Pacific Railroad Company stock and 50 shares of the "Mackay" stock.

At the prices at which the remainder, namely,

  200 shares of American Car & Foundry Co.,
  200 shares of U. S. Steel Corporation,
  100 shares of Pressed Steel Car Co.,
   20 shares of "Calumet & Arizona,"
  100 shares of "Mackay,"
   40 shares of M. K. & T. R. Co.,

were bought as shown by the evidence, the entire amount expended to buy them for Hughes by Finley Barrell & Co., must have been approximately $32,000.

The evidence tends to show that by payments of sums in cash and by leaving with Finley Barrell & Co. the proceeds of stocks sold for Hughes' account through them, Hughes had paid of these advances, either when the purchases were made (or at all events before October 1, 1907) about $11,000. About $21,000 therefore was unpaid. This is consistent with the November account sent by the defendants to Hughes, which gives $22,529.31 as the amount of Hughes' indebtedness to them on October 31, 1907, after a further purchase at about $1,100 of 30 shares of North Butte stock, hereinafter mentioned, had been made and various items of interest had been charged. The stock market after these purchases in July and August, 1907, above recited, were made, seems to have been in a weak and falling condition, so that by the early days of October the margin which the $11,000 represented had either entirely or nearly disappeared. So on October 9th and subsequently, collateral to further "margin" the account was put up by Hughes, all at the Detroit office of Finley Barrell & Co., and receipted for there in their name by their representatives as follows:

October 9th, 1907, 3 one thousand dollar bonds of the Chicago and Alton Railroad.

October 15th, 1907, 25 shares of "Norfolk and Western" common stock.

Also on October 15th, 1907, 20 shares of "Denver & Rio Grande" preferred stock.

October 16th, 1907, 2 more one thousand dollar bonds of the Chicago and Alton Railroad; and also on

October 16th, 1907, 3 one thousand dollar bonds of the Central Leather Company.

So far as there is any evidence on the subject to be derived from comparison and computation, the market value of this collateral was not far from $8,000. Evidence was introduced, the general effect of which was that such collateral must and would be considered under the usages of the business as good for margins only at a discount from its market value. It may safely be said that the evidence tended to show that it was at least to be reckoned at $6600 for the purposes of "margin." As the defendants were carrying 660 shares of stock for the plaintiff, this would be in itself what is called in the business a margin of ten points, and it is not improbable that this was approximately the situation of the account on October 16th, although in the absence of precise evidence as to the market prices on October 16th of the bonds and stock involved, exact figures cannot be arrived at. It is not necessary for the decision of the issues in this case that they should be. But what happened between the plaintiff and the defendants on October 17th is very material.

At some time previous, stated in the evidence as probably two weeks before or on about October 1st, Hughes, who was seventy years of age and somewhat of an invalid and dreaded the coming winter, informed Walder & Hayhurst that he was going to Europe for six months. This was communicated by Walder & Hayhurst to Finley Barrell & Co., at Chicago, and under date of October 16, 1907, Finley Barrell & Co. wrote their agents in Detroit the following letter:

"October 16, 1907.

Messrs. Walder & Hayhurst,
    Detroit, Mich.

Gentlemen:—With reference to the account of J. H. Hughes as wired yesterday. We would suggest that if Mr. Hughes is going to Europe to be gone six months, the safest plan for him to pursue is to take up and pay for his stocks in full. There is no telling what this market might do during the next six months, and we wish to have him arrange to have margins put up promptly during his absence or have him give selling orders. Please take this matter up with him at once and advise us.

                    Yours very truly,
                    FINLEY BARRELL & CO."

This letter was shown by Mr. Hayhurst to Hughes on October 17th. Exactly what was said between them is in dispute.

Mr. Hughes testified that he told Mr. Hayhurst that he was going away at once, but would be at the Belmont Hotel in New York for a day or two until he got a ship, but after he sailed would have no address for five or six weeks, as he would be moving about and did not know where he would be.

Mr. Hayhurst testified that Hughes said he was going to Europe for six months or more, and that he could not give any address where he would be at any time—the implication apparently being that he could not be heard from for the entire six months—manifestly a very different thing. It may be noted, as bearing on the jury's decision on conflicting testimony, that as a matter of fact, after a journey through London, Rome and Naples to Cairo, Hughes did inform the defendants at the end of two months of an address at which he could thereafter be reached.

Again, Hughes testified that when on October 17th he brought in further collateral, as hereinafter stated, Hayhurst not only parted on friendly terms "with a

handshake and good bye," but told him "it was all right."

Mr. Hayhurst, after testifying at first that his "best recollection" was that "what happened on that day was a continuance of efforts to have Hughes fix his accounts so there would be no further trouble in case of a break in the market, to put up, that is, cash or securities in ample amount to protect us in case we could not reach him," swore, after some pressing (although repeatedly stating that he could not remember with exactness), that the substance of what was said was that "the rules and regulations of all first class stock exchange houses might be enforced and his stocks sold out if they looked dangerous in the way of making a loss for the firm," and, finally, "that the stocks should be taken up and paid for before he left, in order to get the account in good shape for all concerned."

Mr. Hughes denies this, and as it is to be presumed the jury followed the instructions of the court, hereinafter mentioned, it is evident they believed that Mr. Hughes', and not Mr. Hayhurst's, recollection was correct in relation to this. We think they were justified in doing so in view of what indisputably happened later on that day. Although, as before indicated, the stock carried by the defendants for Hughes was then margined by at least "ten points," Hughes brought in to Hayhurst and Hayhurst accepted and sent to Chicago to the main office, where it was retained and held, additional collateral in the form of three one thousand dollar Nova Scotia Steel and Coal Company first mortgage bonds, for which Hughes had paid 111 five years before, which had paid promptly 6 per cent interest annually during that time, which were listed in Canada and, as Mr. Hughes testifies, would have sold for 105 "across the river" (presumably meaning in Windsor, Canada), and about which

for some reason Finley Barrell & Co. had made inquiries from bankers in Toronto the month before, receiving information that although "there was little or no market for them," they sold for about "105 flat." This reception of this additional security, significant in itself of what understanding was reached between the parties in the preceding conversation, was rendered more so by the fact that thereupon Hughes gave and Finley Barrell & Co., through Hayhurst, accepted and executed an additional order from Hughes for the purchase of stocks. It was for the purchase of thirty shares of North Butte Co. stock at 56, and amounted to $1080, thereby increasing Hughes' indebtedness to Finley Barrell & Co. by that amount. This order was not only then executed, but as Hughes testified, the execution was reported to him on that day by mail in a note addressed or sent to him at the Hotel Belmont in New York, the address which he had given Hayhurst.

There is, in our opinion, no merit in the contention that Walder & Hayhurst in dealing with Hughes were not invested with full powers to bind Finley Barrell & Co., whose Detroit representatives they were; and we think, in view of all the evidence and circumstances, that notwithstanding concurring testimony as to the absence of "a special agreement," which counsel for appellants insist on, the jury were not unjustified in the spirit if not the letter of the special findings hereinafter more specifically alluded to, to the effect that the defendants made a "new agreement" with the plaintiff prior to the departure of the plaintiff for Europe.

It will be seen that considering the Nova Scotia Steel and Coal Company bonds as worth par, and taking into account the new purchase of North Butte stock, Finley Barrell & Co., on October 17th, had, for an indebtedness of approximately $22,500, collateral

to approximately the amount of $10,000, besides the stocks bought and carried by them, which were also security for that indebtedness. These stocks, as the evidence shows, were worth on November 20th, when a part of them were sold and when there had been a further decline in the market for stocks, about $21,000. It appears by the testimony of Mr. Streich, a representative of the defendants, that all the securities, stocks carried and collateral, were worth together, on November 20th, $3,600 less than on October 17th. As the entire security, therefore, for the approximate indebtedness of $22,500 on October 17th was probably approximately $34,000, there is no inherent improbability that the defendants, through their agents, considered themselves safe for a period of five or six weeks, during which, as they had been notified, they would have no address for Mr. Hughes.

But the market continued to decline after October 17th and after Mr. Hughes had sailed for Europe. On October 22, 1907, the Knickerbocker Trust Company of New York failed and in the same week many rumors of failures and various runs on banks occurred in New York. On October 28th the banks of New York and Chicago refused payment of currency and issued clearing house certificates in payment of depositors' checks.

The defendants, Finley Barrell & Co., because of the nature of their business, were heavy borrowers. They had demand loans from country banks of $350,000, which were called. They had about $50,000 deposited in Pittsburgh banks and money also in Kansas City, as well as in Chicago and New York on deposit. The money in other cities was, as a member of the firm testified in this case, useless to them except to pay bills in the respective cities, and these they did not have. It can be easily seen that they would be anxious to realize on available assets and claims.

Mr. Babcock (of the firm of Finley Barrell & Co.) testified in this case:

"We wired New York and we wrote the Postmasters and we tried to ascertain from the friends—we asked Mr. Hayhurst and Mr. Walder and other friends of ours in Detroit to see if they could find the whereabouts of Mr. Hughes. During all this time we were going through this terrible panic we could find no trace of any sort or description. We waited until a time had elapsed over a month from the time of the purchases of these stocks, and his disappearance, until the 20th day of November. The financial situation was no better. The stock market may have been a dollar a share higher or lower; some stocks were higher and some lower, but there was the uncertainty that a crash was imminent at any time. You could not get any money. Clearing house certificates were issued. As I said, we could not get any money out of Pittsburgh and I thought it was our duty to our customers to put that account in shape. I myself sold the order. I take the responsibility of it myself. So we put in an order to Mr. Streich to sell that amount to minimize the loss."

This testimony relates to the sale by the defendants on November 20, 1907, for the account of Hughes of the 200 shares of Car Foundry stock, the 200 shares of U. S. Steel stock, and the 100 shares of Pressed Steel Car Company stock, which they were carrying for him. They sold at the current market prices of that day on the open market. This left them with the 20 shares of Calumet and Arizona stock, the 100 shares of Mackay Company, the 40 of Missouri, Kansas & Texas, and the 30 of North Butte Co., and left also in their hands the collateral consisting of the 5 Chicago & Alton bonds, the 3 Central Leather Co. bonds, the 3 Nova Scotia Steel & Coal Co. bonds, the 25 shares of Norfolk & Western stock, and the 20 shares of Denver & Rio Grande stock. It appears that before the sale

the market value of all the stock carried and collateral held, taken together, had declined to the amount of $3,600 between October 17th and November 20th, although during which part of the time does not appear otherwise than by Mr. Babcock's testimony that on October 28th "stocks touched the lowest point." It would thus appear that at the time of the sale Finley Barrell & Co. had in the value of the stocks and collateral they held as security for Hughes' indebtedness of approximately $22,500, about $30,500. In view, however, of the usages of the stock exchanges, the defendants claim that this would make a margin of less than 10 "points," as they were entitled to ask for margins on the collateral deposited as well as on the stock bought and carried and to count each thousand dollar bond as equivalent in this computation to 10 shares of stock. They further claim that the Nova Scotia bonds should be disregarded, because of the want of a market here for them and inability to borrow on them, which Mr. Babcock testified to, and that therefore the amount of stock and bonds to be considered should be reduced in computation to the equivalent of 815 shares and the estimated "margin," as counsel for appellants claim, to $5,700, or about seven "points."

We give these approximate figures to make clear the position and relation of the parties and the claims of the appellants, and not because we deem them material in the final application of the legal rules which we conceive govern this case.

The sale which the defendants made netted $11,220 and taking into account interest charges and dividend credits to Hughes, the account on the books of the defendants was left on November 30, 1908 (as appears from the statement as of that date afterwards sent to Hughes), showing an indebtedness of Hughes to them of $11,528.28, for which they still held as security, as above stated, the shares of Calumet and Arizona stock,

the shares of "Mackay," the shares of "Missouri, Kansas & Texas" and of "North Butte," and in addition the collateral of the Chicago and Alton, Leather Co., and Nova Scotia Company bonds, and of the Norfolk & Western and Denver and Rio Grande stock.

Thereafter these communications and actions between the parties followed: December 14, 1907, Hughes wrote the defendants (their Detroit branch) from Cairo, Egypt, as follows:

> "Hotel D'Angleterre, Cairo,
> December 14, 1907.
>
> Messrs. Finley Barrell & Co.,
>     Detroit, Mich.
>
> Gentlemen:—Kindly send my statements to me in c|o of Credit Lyonnais, Nice, France. I leave here to-morrow bound for that place.
>
>     Yours resp'y.,
>     James H. Hughes."

Mr. Hughes arrived at Nice December 19, 1907, and on January 16, 1908, there received by mail some monthly statements of account from the defendants, dated Chicago. Whether the October statement was among them does not appear, but those covering November and December at least were included, and the November statement showed the sale on November 20th of the stocks above recited to have been then sold. Mr. Hughes immediately wrote and mailed the following letter:

> "Nice, France, Jan. 16, 1908.
>
> Messrs. Finley Barrell & Co.,
>     Detroit, Mich.
>
> Gentlemen: Just received statement and see you have sold the largest part of the stocks you were carrying for me. Will you explain to me why you sold them without an order from me and before my margins were exhausted—or don't you have to explain?
>
>     Yours resp'y.,
>     J. H. Hughes."

On February 12, 1908, Hughes wrote the following letter, addressing it to the defendants at Chicago:

"Nice, France, Feb. 12. 1908.

Messrs. Finley Barrell & Co.:

Gentlemen:—I beg to acknowledge the receipt of your favor of the first inst. with statements enclosed. Your interest charges for Oct., Nov. and Dec. are altogether too high. I wrote to your branch at Detroit asking why you sold my stock without an order. I have had no answer."

Meanwhile, however, there had been written from the defendants' office at Detroit a letter to Hughes, which he received after writing his of February 12th. It was as follows:

"Detroit, Mich., February 3, 1908.

Mr. J. H. Hughes,

Nice, France.

Dear Sir:—Yours of Jan. 16th remains unanswered by the former managers, Walder & Hayhurst. Your stocks were sold out in November, 1907, during the money panic, because at that time all brokers required customers to take up and pay for all long stocks. As the balance of your collateral during the panic was not sufficient to pay for the stocks you held on margin, the firm was compelled to protect itself by selling out some of your stocks.

I am told by the former Managers that they did not know where to reach you during the panic, so that they were unable to get an order from you to sell them. It was an unfortunate occurrence, but one that happened to a good many people during October and November, 1907.

Yours truly,

FINLEY BARRELL & Co.,

Per Graham Duffield,

Detroit Manager."

On April 15, 1908, Hughes wrote as follows:

"April 15, Nice, France.

Messrs. Finley Barrell & Co.,
        Chicago, Ill.

I beg leave to advise you that I leave here in a few days and will notify you of my new address.

Resp'y.,
J. H. HUGHES."

On or about June 15, 1908, Hughes arrived in the United States and on July 8th or 9th came to Chicago —as soon, he says, as his health permitted.

On July 11th he gave to A. O. Brown & Co., a firm of stock brokers, the following order, addressed to Finley Barrell & Co.:

"July 11, 1908.

Finley Barrell & Co.,
        Chicago, Ill.

Gentlemen:—Please transfer my stock account with all securities and open accounts to A. O. Brown & Co., and pay to or collect from said parties funds to even up my account with you, and oblige,

Yours very truly,
JAMES H. HUGHES.

List Stocks and Bonds,
        20 Cal. & Ariz.,
        40 M. K. & T. Pr.,
        30 No. Butte,
        100 Mackay,
          3 M. Cent. Lea. 5's,
          5 M. C. & A. 3½,
        20 D. & R. G. Pr.,
        25 Norf. & West.,
          3 M. Nova Scotia 1st."

A. O. Brown & Co. presented the order to Finley Barrell & Co., paid them the amount which the books of Finley Barrell & Co. purported to show was due from Hughes to them, being between $11,500 and $11,-

600, and received, either in Chicago or New York, for Mr. Hughes the stocks and bonds according to the list appended to the order.

On July 20, 1908, Hughes, still in Chicago, wrote to Finley Barrell & Co.:

"Gentlemen:—I enclose herewith an order to sell the balance of my stock that you are holding for me or should be holding. It is the stock you claim to have sold for my account last November without an order from me and without my consent. When you sell it send me a draft for the proceeds less the amount due you on it November last. There is also an overcharge for interest of at least $300 that must be made good. Unless I hear from you at once I shall act accordingly.
                                        JAMES H. HUGHES."

On July 22, 1908, Mr. Hughes retained counsel, who on July 23rd called at Finley Barrell & Co.'s Chicago office, and made a demand for the stock that had been sold on November 20th, and on this demand being refused with a statement that the stock had been sold, "discussed other matters in relation to the settlement."

Although the testimony is not explicit as to what was said, we think there is a fair legal inference to be drawn from the course of business and correspondence up to that time, that the demand carried with it an implication that if the stocks in question were delivered, Hughes would pay to Barrell & Co. the amount with which he had been credited on their sale on November 20th, namely, $11,220, and that if the account was to be otherwise settled he claimed the difference between that amount and the sum at which they could have been sold at market prices on July 20th, when he gave the order to sell above recited.

On August 11, 1908, the present suit was brought.

After evidence showing the above state of affairs was heard the Court ruled that the recovery, if any

recovery were made, must be limited to the difference between the price for which the stock involved was sold on November 20, 1907, and its market price within a reasonable time after Hughes was informed of said sale, in which time he could have replaced it. In view of this ruling, the plaintiff apparently waived the claim for a larger recovery based on the prices in July, 1908, when he gave the defendants the order to sell, and claimed only the benefit of the highest price between January 16th and January 20, 1908.

The whole tenor of the evidence showed that after November 20, 1907, there was a rising market up to July 20, 1908. The Clearing House certificates began to be redeemed and withdrawn about January 20th. January 20, 1908, the market price of the stocks sold was $3,400 more than on November 20, 1907. July 20, 1908, it had risen to an extent which made it from $8,400 to $8,800 more than on November 20th.

The court, under instructions hereinafter described, left the general issues and two specific questions to the jury.

The questions in answer to which the jury were directed to return special findings were:

"*First.* Did the plaintiff at any time have a special contract or agreement with the defendants regarding the transaction in question in this case?

"*Second.* Did the defendants, after purchasing for the account of the plaintiff the stocks in question in this case, make a new agreement with plaintiff with reference thereto, prior to the departure of the plaintiff for Europe?"

To each of these questions the jury returned an affirmative answer and, as before stated, found a general verdict for the plaintiff for $3,400.

Applying to the facts above set forth the well known rules of law laid down in New York in Markham v. Jaudon, 41 N. Y. 235, adopted by the Supreme Court of the United States in Richardson v. Shaw, 209 U. S.

365, and by the Supreme Court of Illinois in Brewster v. Van Liew, 119 Ill. 554, and by this court in Whipple v. Tucker, 123 Ill. App. 223, and Schaefer v. Dickinson, 141 Ill. App. 234, the relation between Hughes and the firm of Finley Barrell & Co. as to the stock bought and carried by the latter for the former, is seen to be that of pledgor and pledgee; and one of the duties of Finley Barrell & Co. springing out of the transactions in which the stock was bought for Hughes' account was to hold and carry the stock until Hughes had failed to respond to "margins" called for under the usage and custom of the business, or had failed to pay in full and take the stock if required and notified to do so. If reasonable notice is given with such a demand that on failure to comply with said demand the stock will be sold, or if reasonable notice is given on such failure that a sale will be made, the broker, who is in law a pledgee and subject to the rules of law concerning pledges, may sell. But notice is indispensable.

If, says the Court of Appeals in New York in Markham v. Jaudon, the broker wishes to have the right to sell without notice, he must secure that right by a special contract. This is admitted by the defendants in this case to be the rule under ordinary circumstances, where the broker has the address of the customer, but it is insisted by them that where the customer, by going away without leaving an address, puts it out of the power of the broker to demand that the customer take and pay in full for the stock the broker is carrying for him, then, in the absence of some special agreement affecting the matter, the necessity of notice in "closing out the trades" by the sale of the stock does not exist. Good faith, then, the defendants say, is all that is required.

The court below in this case fully adopted in his instructions this claimed exception to the general rule.

One of its instructions was as follows:

"The court instructs the jury as a matter of law that a broker purchasing stocks on margin for a customer has a right at any time, in the absence of a special contract between the parties, to demand that the customer shall take and pay for said stocks and in case the customer fails so to do, the broker has the right upon notice to the customer to sell the stocks and close the transaction. And you are further instructed that if the customer by his own act shall place it beyond the power of the broker to give him such demand and notice, then in the absence of a special agreement between the parties, the broker may sell said stocks and close the transaction without such notice or demand."

In at least four other instructions the court applied this proposition to the case at bar, and in each virtually—as it did expressly in one of them—instructed the jury that "unless the plaintiff had proved a special contract with the defendants, then under the evidence in this case" they "must find the defendants not guilty."

We are not prepared to approve these instructions nor the theory which underlies them. But if they were erroneous the error was against the plaintiff and not against the defendants. The defendants could not complain of them. It is at least doubtful, in our opinion, whether, considering the usual course of business in stock brokerage, the right to sell without demand and notice must not be the right secured by "special contract" in any given case; whether, that is, in the language of the court in Markham v. Jaudon, if there is a necessity that the broker should have power to protect himself in any case by an immediate sale without notice, he must not "secure himself by such a special contract giving him such right to sell without notice." If such special contract was necessary, it would be for

the defendants to prove,—a reversal of the obligation put on the plaintiff by the court's instructions.

But whether this position, or the rule contended for by the defendants, be the correct one, it is, in our opinion, more than doubtful whether when a broker holds stocks for a customer upon margins, and is informed by the customer that "he intends to be absent from his home and place of business so that notice cannot be served on him for a reasonably short fixed length of time," and the broker allows him to go without decisively exercising his right to call for payment in full, the broker can, in the absence of a special contract to that effect, sell the customer's stocks without notice during that fixed time, whatever the emergency.    It would seem to us that the burden of protecting himself by a special contract would be clearly on the broker in such a case, and that consequently to have arrived at their decision in this case as to the liability of the defendants, the jury need not have found in addition, as they were instructed by the court in effect they must, that the customer, when giving the notice concerning his expected absence, must "deposit collaterals reasonably sufficient to indemnify the broker from loss during such reasonably fixed period of absence, and the broker must accept such collateral so deposited and express his satisfaction therewith."

But it is not necessary for us to decide even this in the present case, nor to discuss and distinguish the cases on which the defendants base their contrary position; for we think the jury in the conflict of testimony were justified in holding that the plaintiff had maintained his case even under the doctrine of the following instruction of the trial judge, which summed up the conditions held by him necessary to a recovery:

"If the jury believe from the evidence in this case that the plaintiff informed the defendants' agent a reasonable length of time before his departure, that

he intended to depart from this country for Europe and that he would be absent from the United States for several months, and that he would have no fixed address for six weeks after sailing, and deposited with defendants collateral reasonably sufficient to insure the defendants against loss from the depreciation of the stocks mentioned in the declaration during said six weeks, and the defendants, after reasonable notice given to them of his intended departure, accepted said collateral and did not require him to close his deals with them and gave him to understand by their words and conduct that they were satisfied with the collateral deposited and with his intended departure, and by their words and conduct induced the plaintiff to believe, and the plaintiff did believe, that his said stocks would not be sold within said six weeks without exhausting the collateral deposited, and plaintiff left this country in that belief, and that the defendants, without notice to plaintiff, within said six weeks after his departure sold out the stocks in question without resorting to the collateral deposited, and that the plaintiff suffered loss thereby, and that plaintiff has proved all of the allegations in his declaration by a preponderance of the evidence, then their verdict should be for the plaintiff.''

We think the jury had the right to find, in the evidence of the facts hereinbefore detailed, justification for an affirmative answer to the specific questions presented to them, construed in the light of this instruction. And, therefore, we are of the opinion that the decision that inhered in their verdict that a liability existed from the defendants to the plaintiff after the sale up to the time, on January 16, 1908, when he received notice of it, should be recognized as final.

This leaves for our consideration the questions whether the defendants made good, as a matter of law, their affirmative defense, insisted on, that by non-

repudiation of the sale or by acceptance of the account presented to him (which credited him with the proceeds of that sale), and conformable action thereon, the plaintiff waived or released that liability and cause of action. We do not think that he did.

By the instructions of the court the jury were left to determine the question whether or not the plaintiff ratified the act of the defendants in selling the stock, and were told that they had a right to take into consideration all his acts and conduct after notice to him of the sale; and that it was his duty after such notice to repudiate said sale within a reasonable time, if he did so at all.

We think the jury decided correctly—certainly that there is no ground for our setting their decision aside as plainly against the evidence.

The letter of the plaintiff of January 16, 1908, from Nice, we do not think can be reasonably interpreted as anything but the expression of a man irritated and angered by the information he had received. It was in no sense an acquiescence in the sale, and we think it may properly be considered, in view of the other circumstances proven in the case, a repudiation of it.

It is true that after that for some time, and until he returned to America and visited Chicago, the plaintiff was silent as to the matter, but there were no interests of third parties involved, and in view of the measure of damages insisted on by the defendants, laid down by the court, and adopted by the plaintiff, limiting the recovery by consideration of the price of the stock up to January 20, 1908, only, and of the fact that the evidence taken together shows a rising market for stocks from January 20, 1908, to the date of the beginning of the suit, no harm could have resulted to the defendants from this silence, and we do not consider it material.

The claim that the plaintiff ratified the sale or waived his claim against defendants on account of it

by his instructing Finley Barrell & Co. "to transfer his stock account with all securities and open accounts to A. O. Brown & Co., and to pay or to collect from A. O. Brown & Co. funds to even up his account with them," and by A. O. Brown & Co's., because of such instructions, paying for the release of the stock and collateral in the hands of the defendant, an amount which was computed on the basis of a credit given to the plaintiff on account of the repudiated sale,—can be based only on the theory that the plaintiff, by his agents, thus agreed to "an account stated." We do not so view the transaction. The amount paid was indeed more than $11,000 less than the plaintiff would have been obliged to pay as an indebtedness to the defendants had the unauthorized sale not been made, and less by that amount than the theory of the plaintiff made that indebtedness; but, on the other hand, had the account shown the whole amount of the indebtedness which the plaintiff's theory admitted, on its payment the plaintiff would have been entitled to receive the 200 shares of steel stock, the 200 shares of Car Foundry stock and the 100 shares of Pressed Steel Car stock, which were worth at that time, according to the evidence, $8,400 to $8,800 more than the additional $11,220 which the plaintiff would have been obliged to pay.

To make an agreed "account stated" which binds the parties, there must be a meeting of minds upon it. The circumstances of this case forbid the belief that it occurred here. The defendants were not injured or misled by the payment of the lesser amount. On their own theory they could hold the bonds and stocks they had, for no more; and since, by their own actions, they had put it out of their power to deliver the other stock and had so stated to the plaintiff, they cannot complain that he paid the lesser amount without protest to release his remaining property. We think this position is borne out by authority—e. g. Stenton v.

Jerome, 54 N. Y. 480—and that the cases cited by appellants to the contrary can be easily distinguished.

We have already expressed our opinion that the measure of damages adopted was correct. It was the most favorable one which could be asked by the defendants if liability existed. It was the rule adopted in Baker v. Drake, 53 N. Y. 211, modifying the rule less favorable to the defendants laid down in Markham v. Jaudon (supra), and was the one seemingly approved in Brewster v. Van Liew, 119 Ill. 554.

We find in the record no error prejudicial to the defendants, and we affirm the judgment of the Municipal Court.

*Affirmed.*